STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |
|---|---|
| In re: Unified Buddhist Church, Inc., | } |
| Act 250 Permit Application | } Docket No. 191-9-05 Vtec |
| (Appeal of Lull's Brook Watershed Ass'n, et al.) | } |

Decision and Order

Appellants Lull's Brook Watershed Association, John and Amy Zelig, Sterling R. and Marion Monk, Catherine Bacon, Peter Gordon, and Elaine Brousseau appealed from a decision of the District 3 Environmental Commission granting Cross-Appellant-Applicant (Applicant) Unified Buddhist Church, Inc.'s application for an Act 250 Land Use Permit for the "Green Mountain Dharma Center" on a 148-acre parcel of property in the Town of Hartland. Appellants are represented by David Grayck, Esq.; Applicant is represented by James P. W. Goss, Esq.; the Vermont Agency of Natural Resources (ANR) is represented by Catherine Gjessing, Esq. The Natural Resources Board is represented by John H. Hasen, Esq.; it has not participated in the trial or filed memoranda on the merits of this application.

A related appeal, Docket No. 253-10-06 Vtec, involving an application for renewal of the Indirect Discharge permit applicable to the property, is scheduled for trial in late January 2008.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken in advance of the hearing with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

1

The project property is an approximately 148-acre parcel of land located on Ayers Lane, off Town Farm Hill Road, in the Town of Hartland. Town Farm Hill Road is a two-lane gravel Class III town highway. Prior to the property's transfer to the Unified Buddhist Church, Inc. it contained two existing houses, three barns and other outbuildings used for horses and equestrian activities. Since its transfer to the Unified Buddhist Church, Buddhist monks and nuns have been living in the existing buildings as their primary residences, and have been making retreat time and space available to the public on a limited basis, generally for period from a weekend to two to three weeks. The existing buildings with toilet facilities are served by on-site septic systems, except that the main house is served by a composting toilet system; the system tanks have been pumped out on a regular basis and have not failed.

The portion of the project property (the "upper property area") containing the buildings and the proposed uses (other than the proposed wastewater system), is located at an elevation of approximately 900 to 940 feet above sea level. The project property slopes steeply downward from the upper property area towards the south to Lull's Brook, at an elevation of approximately 660 feet above sea level, and includes property southerly of Lull's Brook, between the brook and Brownsville Road, where the wastewater disposal system is proposed to be located (the "lower property area").

The project property is located in an area of the Town of Hartland characterized as rural in the Town Plan. However, the project property is not in the most rural area of the town; rather, it is located near the rural-residential area and near a hamlet in the "Village" land use area at the intersection of Town Farm Hill Road and Brownsville Road. The area is characterized by relatively large parcel residential uses, some commercial or residential-based business uses, and some institutional uses such as the town offices, a school, and other churches in the nearby hamlet or village area.

No special, unique, or fragile areas are located on or adjacent to the property and

2

none are alleged to be adversely affected by the proposed project. The property is located in a "headwaters" area as that term is used in Act 250 Criterion 1(A). 10 V.S.A. §6086(a)(1)(A).

The Unified Buddhist Church, Inc., is a Vermont non-profit corporation. The project proposed for the property is to renovate existing buildings and structures and to construct new buildings and structures to provide a Buddhist religious retreat and meditation and meditation education center ("dharma" or teaching center). The religious and meditation practices conducted at the project property require a quiet and peaceful environment; the aim of the project is to create an environment of quiet meditation and reflection which is environmentally sensitive.

Twenty-four Buddhist monastics (monks and nuns) will live and work year-round at the property. Ten are proposed to be housed in the existing main house, six in the existing guest house, and eight in the new dormitory. The activities to be conducted at the project property include religious and meditation retreats for individual members of the public, assisted by the presence of the resident monastics, and instruction in Buddhist teaching and meditation, including the practice of mindfulness meditation, for the general public. As well as the resident monastics, a maximum of 77 additional overnight occupants at any one time are proposed to be accommodated on the site in the summer season, plus an additional 42 daytime visitors. A maximum of 41 additional overnight occupants at any one time are proposed to be accommodated on the site during the remainder of the year, plus an additional 30 daytime visitors.

The proposed use of the property is essentially a religious and educational one; the daily schedule involves sitting and walking meditation sessions, prayer, instruction sessions, small group discussion sessions, meals and rest periods. The proposed use of the property is not a commercial use in the nature of a resort, as the modest overnight fees are set at a rate only to cover the costs of operating the facility, including the teachers,

3

scholarships or reduced fees for those who otherwise would not be able to attend, and support of the resident monastics,

The project proposes the following residential structures to be capable of accommodating overnight occupants in all seasons: the renovation of the existing main house to accommodate ten occupants, the renovation of the existing guest house to accommodate six occupants, and the construction of a new dormitory building to accommodate forty-eight[1] or forty-nine occupants. In addition, the project proposes the construction of a residential hut to accommodate visits by Applicant's spiritual founder: Thich Nhat Hanh.

The project proposes the following residential structures to be capable of accommodating overnight occupants in the ninety-two-day summer season only: the renovation of the pole barn to accommodate twenty summer seasonal occupants, and the renovation of the sheep barn to accommodate sixteen seasonal occupants (bathroom facilities in a separate structure).

In addition to the residential facilities, the project proposes the renovation of one existing barn (the "Lotus Bud Hall Barn") for classrooms, a library, and a meditation hall; the renovation of the other existing barn (the "Big Horse Barn") for meeting rooms, classrooms, and storage; and the renovation of the existing shed. In addition to the residential facilities, the project proposes the construction of the following new buildings: a meeting hall, a children's building, a bathroom complex, and a kitchen/dining room/upper bathroom co-housing facility.

The proposed new buildings are clustered on the upper property area near the existing complex of buildings. They are designed to be similar to the existing New England

---

[1] The wastewater system calculations at the time of the permit application used forty-eight occupants. Evidence reflecting forty-nine may have been intended to include the Thais hut when it was in use.

rural architecture of the existing buildings on the site and are proposed to be painted in earth-tone colors. The buildings on the property are not substantially visible from beyond the project property or from public roads. The appearance of the lower property area after installation of the waste disposal system will be similar to its present condition as an open field, with the addition of manholes, a vent, and a small control panel. The property will not have a visual aesthetic effect on the public or on adjoining properties different from the effect of the existing development of the property.

The project proposes a new well for the facility. The project proposes to use flush toilets and to install a new wastewater disposal system designed to accommodate 9,500 gallons per day, that is, designed for the maximum daily use in the year. This system size provides a safety factor as the calculated design flow is conservative; the actual flows experienced for this type of use is generally from 50% to 65% less than the design flows. The proposed system is expected to experience this full use for which the design flow was calculated only on the ninety-two days of the year constituting the summer season

The proposed new septic system is designed with septic tanks and grease traps on the upper property, in which solids will settle out, so that the remaining wastewater from the facility buildings will be piped downhill and under Lull's Brook to a subsurface disposal field on property near Lull's Brook. The disposal field will operate without creating odors or noise. The operation and monitoring proposed for the disposal system is more fully discussed in connection with Criterion 1 below

The project has been issued a Water Supply and Wastewater Disposal permit (#WW-3-0550-R1) by the ANR. It has also been issued a renewal of its Indirect Discharge Permit #ID-9-0271-2 by the ANR; this is the permit on appeal in Docket No. 253-10-06 Vtec.

The project proposes the installation of unlighted footpaths on the property, and an unlighted sign at the intersection of Town Farm Hill Road and Ayers Lane. No area or space lighting is proposed. The project also proposes the installation of sixty-one gravel

5

parking spaces and areas for the parking of fifty-nine additional vehicles on grass.

Criterion 8

The burden of proof is on Appellants with respect to Criterion 8, involving the aesthetics of the proposed project.

The buildings on the project site are not substantially visible from beyond the site or from traveled public ways. The proposed buildings are designed to be compatible with the existing cluster of rural buildings on the site. The portions of the septic system on the lower project area are designed not to result in odors and will not be visible, except for an unobtrusive vent and control panel. Its manholes are proposed to be installed flush with the level of the surrounding ground, so that the area will continue to have the appearance of an open field. The activities proposed for the upper property, involving mindfulness meditation while walking or sitting, are proposed to be quiet and peaceful in nature. The noise of private passenger vehicles entering and existing the site will be occasional and not unusual for the area.

Because Appellants have not shown any adverse aesthetic effect from the proposed project, it is unnecessary to analyze the issue of undue adverse aesthetic effect. The proposal meets Criterion 8 of Act 250 as to aesthetics. 10 V.S.A. §6086(a)(8).

Criterion 10

The burden of proof is on Appellee-Applicant with respect to Criterion 10, involving the compliance of the proposed project with the Town Plan and any applicable regional plan.

The applicable regional plan contains no provisions specific to land within the Town of Hartland, as it had joined the Regional Planning Commission after the date of the application. The proposal meets the general provisions of the Regional Plan as to land use

6

in rural areas, at pp. 31–32, which generally calls for the preservation of open space, the clustering of housing, and the development of rural land near villages and hamlet areas in preference to the development of more remote rural land. The proposed project carries out these provisions, and is consistent with the plan's statement that even certain "non-residential uses [such as] inns are acceptable land uses for rural areas," provided that they are relatively small-scale, are not the primary or dominant uses in an area, and do not unduly affect rural character. Regional Plan, at p. 32.

Unlike many Vermont municipalities, the Town of Hartland has a town plan but has not adopted zoning to implement the plan. If the Town had zoning, it would be subject to 24 V.S.A. § 4413(a), which limits the degree to which municipalities may regulate certain uses, including "churches and other places of worship, convents, and parish houses," and allows such regulation "only to the extent that regulations do not have the effect of interfering with the intended functional use" of the facility. This Court has ruled in In re Appeals of Valsangiacomo, Docket Nos. 130-8-03 Vtec and 64-4-04 Vtec, slip op. at 6–9 (Vt. Envtl. Ct., October 5, 2004), that this limiting language effectively carries out the federal Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. 2000cc et seq., with respect to Vermont zoning. The former Environmental Board has also recognized the applicability of RLUIPA to Act 250 decisions. In re: Alodium Church, Land Use Permit #3W0637-5-EB (Docket No.825), Findings of Fact, Conclusions of Law and Order, slip op. at 7–9 (Vt. Envtl. Bd., June 30, 2005). This Court is directed by statute to give the same weight an consideration to prior decisions of the environmental board as it gives to its own prior decisions. 10 V.S.A. §8504(m).

However, it is not necessary to analyze the effect of RLUIPA unless the proposed project is inconsistent with the Town Plan; in the present case, the proposed project is not inconsistent with the Town Plan. The Town Plan categorizes most of the town as rural, with areas of village and rural-residential use. The Plan primarily discusses the placement

of businesses, commercial and industrial uses with reference to the interstate interchange and the village areas, and the preservation of single family residential and agricultural uses in the more remote rural districts. The Town Plan is relatively silent as to non-public schools, churches or other cultural and religious institutional uses. The density proposed for the site is consistent with the Town Plan's provisions encouraging clustered residential development in rural areas to maintain open space and the rural residential character. The proposal for handling the wastewater for the facility also meets the Town Plan's policy to maintain and improve the quality of the Town's surface waters, protective of Lull's Brook (see discussion at Criterion 1, below).

Accordingly, the proposal meets Criterion 10 of Act 250 as to compliance with the municipal and regional plans. 10 V.S.A. §6086(a)(10).

Criterion 1

The burden of proof is on Appellee-Applicant with respect to the subsections of Criterion 1 at issue in this case, involving whether the proposal will not result in undue water pollution. 10 V.S.A. §6086(a)(1)(A)(B) and (E).

First, with regard to the subsections of Criterion 1 relating to erosion and stormwater, the project will not create any significant impervious or paved areas, and an adequate erosion control plan is in effect to successfully deal with the potential for erosion during construction. No appeal has been filed of the project's construction general permit, its stormwater discharge permit, or its stream crossing permit. Accordingly, the proposal meets Criterion 1 of Act 250 as to issues relating to erosion and stormwater.

The project has received a Potable Water Supply and Wastewater Disposal Permit from the Agency of Natural Resources, which has not been appealed, and has received an Indirect Discharge Permit, the renewal of which is on appeal in Docket No. 253-10-06 Vtec.

Because of the pendency of the Indirect Discharge Renewal Permit appeal, it is

particularly important to note the differences in the presumptions and standard of proof applicable to this Act 250 appeal compared to those applicable in the appeal of the ANR's decision on Applicant's Indirect Discharge Renewal Permit. In this appeal of the Act 250 permit, under 10 VSA § 8504(i) any technical determinations of the ANR are to be accorded the same deference as they are accorded by a district environmental commission under 10 VSA § 6086(d), which provides that "technical determinations of the agency shall be accorded substantial deference."

Thus, in this Act 250 appeal, the Agency's technical determinations associated with its work on the Indirect Discharge Renewal Permit must be accorded "substantial deference" by this Court, even though the appeals statute accords no such deference in the related appeal from the ANR's own decision on the Indirect Discharge Renewal Permit, which is <u>de</u> <u>novo</u> before the Court. The fact that the Court allowed evidence to be presented Criterion 1 under NRB Rule 19(F) did not constitute any kind of ruling on the merits of the Indirect Discharge Renewal Permit,[2] it merely shifted the burden of proof to Applicant to show compliance with Criterion 1. Under that rule the Indirect Discharge Renewal Permit can still be submitted as evidence of compliance; under 10 VSA § 8504(i) the ANR's technical determinations on that permit are still to be accorded substantial deference.

---

[2] Thus, legal questions arising with respect to the Indirect Discharge Renewal Permit must be resolved in the appeal of that permit and not in the present appeal, such as whether the VWQS 1-04.A.2 alternatives analysis applies to an indirect discharge permit application, or whether or under what circumstances multiple disposal systems or innovative systems with separate greywater treatment may ever be considered for approval under 10 V.S.A. §1259(h) and Indirect Discharge Rule §14-203. If proceedings on the Indirect Discharge Renewal Permit (or any future 5-year renewal of that permit) were to substantially change an aspect of the system, then at that time a determination would have to be made as to whether this Act 250 permit would have to be amended. No such issues are before this Court at this time.

The wastewater system is designed to handle a flow of 9,500 gallons per day, which is the design flow calculated to occur only during summer seasonal use of the facility on ninety-two days out of the year.

The domestic wastewater (including from toilets, sinks, baths, and showers) is proposed to flow to septic tanks and grease traps on the upper portion of the project property, in which solids will settle out and be periodically removed or pumped out. The remaining wastewater is proposed to flow through an underground pipe down to the level of Lull's Brook. Applicant has received a permit to install the pipe underneath the Brook so that the pipe will cross under the Brook, and distribute the wastewater into the leach field proposed to be located in the field southerly of Lull's Brook, between the brook and Brownsville Road.

As explained in footnote 2, above, this Act 250 case does not reach the question of whether or what extent an analysis of alternatives is required under the Indirect Discharge Rules. For the purposes of Act 250, in which substantial deference is given to the technical determinations of ANR, the analysis of the topography and test pits on the upper property area, together with the existence and location of at least two surface water ponds, one perennial and two intermittent streams, and a drinking water supply, was sufficient to suggest that suitable locations were not available on the upper property area for the disposal of any more than about two thousand gallons per day, and certainly not for the 9,500 gallons of effluent per day required for the proposed use.

Appellants argued that it would be possible to place multiple in-ground septic systems on the upper site, and that such systems would be more protective of Lull's Brook as they would be a greater distance from it. However, the evidence instead supported Applicant's and the ANR's analysis that the hydrogeologic capacity of the upper area on the property was insufficient to support adequate treatment, even in multiple smaller systems. Further, due to the existence of small surface water ponds and small streams on

10

the upper property, in-ground systems on the upper property would not be able to meet the required degree of treatment to afford protection to those much smaller and closer water courses under the Indirect Discharge Rules.

The proposed leach field at the lower property area is designed as a dual alternating system, so that each half of the total disposal area is in use only every other year, allowing the unused half of the system to recover during the off year. Several features of this system are conservative in that they provide more treatment capacity than will be required by the actual amount of effluent that will be sent into the system. Beyond the fact that the system is designed to accommodate an amount of effluent that will only be generated during full use of the facility in the summer season, the flows for which the system is designed are calculated to be higher than actual flows, resulting in a larger leach field area for treatment of the effluent. The low application rate required in the Indirect Discharge Rules of 0.9 gallons per day per square foot results in the spreading of the effluent for treatment over a larger leach field area. The fact that the system is a 100% dual alternating system means that the treatment area is twice as large as required for the design flow, resulting in additional spreading out over a larger area over time. Moreover, the requirement that a three-foot unsaturated zone exist beneath the leach field during periods of seasonal high groundwater allows for effluent renovation in the soils within that zone, prior to the effluent's reaching the groundwater. The system is placed so as to provide approximately two-and-a-half years of travel time within the soils before the renovated effluent leaving the leach field trenches would reach Lull's Brook. These elements of the design of the Indirect Discharge system mean that it has been designed with enough redundancy to be protective of Lull's Brook.

In addition, the monitoring required for the system is designed to reveal any problems with the operation of the system in ample time to institute corrective measures or to cease the discharge before it could have a significant impact on water quality and well

11

before any untreated effluent could reach Lull's Brook. Monitoring is required of the effluent itself, of the groundwater downgradient of the disposal field, of the surface water in Lull's Brook both upstream and downstream of the discharge, plus biological monitoring of the stream. The latter requirement of indirect discharge systems is very stringent, as it requires a showing that the operation of the system results in no significant alteration of the aquatic biota in the stream.

Appellants argued that the groundwater monitoring locations are insufficient to assure that the groundwater monitoring will actually intercept the effluent plume. However, because certain components of the effluent such as chloride are not attenuated in the treatment system, their presence (or absence) in the groundwater monitoring wells after the system begins operation will provide an early check on whether the effluent plume is intercepted by the monitoring wells.

Appellants presented evidence to support their argument that phosphorus would not be adequately treated in the system and the soils, so that the system would inevitably result in phosphorus pollution of Lull's Brook. However, the application of this calculation method or theoretical model to other existing wastewater disposal systems that have been operating for an extended period of time in Vermont would also suggest that many, if not most of these systems should be experiencing similar failures in phosphorus treatment. Although the failure of such regulated systems would be reported to ANR, only one of 210 systems is leaking phosphorus, and that system is not comparable in type to the one proposed in the present case. (Of the eight most comparable systems, one was tested and appears to show a high degree of removal, depending on the degree to which chloride can be used as a marker for phosphorus removal.) The fact that more Vermont systems are not showing phosphorus breakthrough after long periods of operation supports Applicant's and the ANR's evidence that the system can be expected to function well as designed.

Accordingly, the proposal meets Criterion 1 of Act 250 that it will not result in

12

undue water pollution. 10 V.S.A. §6086(a)(1)(A)(B) and (E).

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Applicant's application for a Land Use Permit under Act 250 is approved with the same conditions as imposed by the District Commission, concluding this appeal. In the conference now scheduled for January 8, 2008, please be prepared to discuss whether the parties wish to suspend the issuance of a final judgment order in this case until the conclusion of the appeal of the Indirect Discharge Renewal Permit.

Done at Berlin, Vermont, this 2nd day of January, 2008.

_____
                    Merideth Wright
                    Environmental Judge